# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2469-23

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

T.B.,

      Defendant,

and

E.R.,

      Defendant-Appellant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF J.S.,
minor.

_____

Submitted February 3, 2025 – Decided March 3, 2025
Remanded by the Supreme Court October 3, 2025
Resubmitted October 20, 2025 – Decided January 14, 2026

Before Judges Sabatino, Berdote Byrne, and Jablonski.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Burlington County, Docket No. FG-03-0005-24.

Jennifer N. Sellitti, Public Defender, attorney for appellant (Catherine Reid, Designated Counsel, on the briefs).

Matthew J. Platkin, Attorney General, attorney for respondent (Melissa H. Raksa, Assistant Attorney General, of counsel; Renee Greenberg, Deputy Attorney General, on the brief).

Jennifer N. Sellitti, Public Defender, Law Guardian, attorney for minor (Meredith A. Pollock, Deputy Public Defender, of counsel; Todd Wilson, Designated Counsel, on the brief).

PER CURIAM

E.R. (Ed) appeals from a judgment terminating his parental rights to his son, J.S. (Jay).[1] The judgment granted guardianship of Jay to the Division of Child Protection and Permanency (the Division) with the plan that his resource parent adopt him. After we affirmed that judgment and concluded the trial court correctly applied the law and supported its legal conclusions with

---

[1] We use initials and pseudonyms to protect privacy interests and the confidentiality of the trial record. See R. 1:38-3(d)(12).

adequate, substantial, and credible evidence, Ed sought review by our Supreme Court.

The Court granted certification and remanded this matter to us to review our opinion without consideration of the Interstate Compact on the Placement of Children (ICPC). To comply with that order, we reviewed the record, the merits briefs of the parties, and counsels' certification materials to the Court. Following this assessment, we reaffirm the outcome of our prior opinion using a fuller analysis and one not dependent on the ICPC.

I.

We summarize the facts from the record and the evidence presented at the three-day guardianship trial conducted in February and March 2024.

Jay was born in April 2020, and tested positive for methadone in utero. After the hospital informed the Division and it began an investigation, a caseworker interviewed Jay's biological mother, T.B. (Tina). Tina admitted to previous substance abuse but stated that she was enrolled in a treatment program.[2] The Division offered Tina family preservation services, permitted Jay to remain in her care, and closed its case after one year.

---

[2] Tina has not appealed the trial court's judgment terminating her parental rights.

A-2469-23

During this time, Tina identified Ed as Jay's father. She also indicated that she had not seen Ed recently and did not have his contact information. Tina and Ed previously lived together, but believing he was "extremely violent", Tina fled to a domestic violence shelter when she was pregnant with Jay. Tina informed the Division that during the three-year relationship she had with Ed, Ed was "extremely violent with her" and she was often the victim of "verbal[,] physical, and emotional domestic violence between them."

Tina's drug use persisted. When confronted with new allegations, Tina initially denied the reports but later recanted and admitted she relapsed. By August 2022, concerns about Tina's capacity to care for Jay resurfaced following eyewitness accounts of Tina's crack cocaine use directly endangering Jay. As a result, the Division executed a Dodd removal[3] of Jay on September 15, 2022. On September 19, 2022, the Division obtained custody of Jay. On October 4, 2022, the Division attempted to contact Ed. A week later, on October 13, 2022, Ed spoke with the Division and agreed to take a paternity test. On January 5, 2023, the Division was informed Ed was Jay's biological father.

---

[3] A Dodd removal is an emergency removal of a child from a parent's custody without a court order according to N.J.S.A. 9:6-8.21 to 8.82, known as the Dodd Act. N.J. Div. of Youth and Fam. Servs. v. P.W.R. 205 N.J. 17, 26 n.11 (2011).

A-2469-23

Ed initially expressed interest in obtaining custody of Jay early in the process. However, Ed's involvement proved inconsistent and was characterized by a lack of follow-through with the Division's recommendations. Throughout the litigation, Ed continued to fail to appear for follow-up calls, family team meetings, and court appearances. He routinely attributed his absence and lack of participation to personal issues, employment demands, and marital conflicts.

Notably, on January 13, 2023, Ed called the Division's caseworker and agreed to attend a virtual family review meeting. Ed failed to attend that meeting and was also absent from the court hearing scheduled for January 25, 2023.

Ed also failed to attend the February 6, 2023, court proceeding. Nevertheless, the court ordered the Division to arrange weekly supervised parenting time and to institute therapeutic visitation between Ed and Jay. Ed was also ordered to "comply with any evaluations as requested by the Division." Ed failed to attend the April 3, 2023, hearing as well. He was again ordered to comply with the Division's request for evaluations and was also ordered to "comply with therapeutic visitation with [Jay]." After this proceeding, however, Ed did contact the Division's case worker. Following

5

that conversation, Ed agreed to participate in both the supervised and therapeutic parenting time.

Ed finally appeared at a virtual hearing on June 26, 2023. At that time, Ed was ordered to attend virtual therapeutic parenting time and was also required to "maintain contact with the Division."

On July 14, 2023, a Resource Home Coordinator with the Montgomery County (Pennsylvania) Office of Children and Youth reported Ed informed that worker that Ed and his current wife confronted "marital problems and [Ed] expressed that he is interested in looking for new housing." In that same letter, despite Ed's assertions that he wished to obtain custody of Jay, "he would like to obtain stable housing first to ensure success in the transition and a healthy environment for [Jay]." As a result of this "current housing instability", the Pennsylvania caseworker instructed Ed to "reach out to his New Jersey caseworker to discuss time frames . . . of when placement [of Ed] would need to occur."

On August 6, 2023, Ed spoke with the Division caseworkers and again informed them that his spouse and he continued to have marital issues, that he continued to search for stable housing, and that he continued to work to achieve financial stability by working three jobs. The caseworker also advised

6

Ed that the ordered therapeutic visitation with Jay would take place in New Jersey. The court set a permanency hearing for August 22, 2023.

Ed failed to appear at the August 22, 2023, permanency hearing and he did not participate in that parenting time.

Ed attended a hearing on October 20, 2023. On that date, he was ordered to attend a psychological evaluation with Dr. Alan Lee, Psy.D., a clinical psychologist. Ed was also ordered to begin visitation.

On January 3, 2024, Ed met with Dr. Lee. Dr. Lee noted in his report that Ed's thinking was generally clear and coherent and he did not display acute psychosis nor major thought disorders. Nevertheless, Dr. Lee did observe Ed as "notably vague, ambiguous, and sometimes circular in his answers, thinking, and explanations." Ed was resistant in his responses, provided contradictory explanations to others, and sometimes refused to answer other questions. Ed displayed a "superficial" psychological affect.

Ed was not, according to Dr. Lee, "physically aggressive", but he was noted to be "very self-centered, grandiose, and resistant to taking any kind of responsibility . . . ." Ed appeared to devote his efforts to offering explanations, excuses, and rationalizations. This led to Dr. Lee's observation that Ed possessed "entrenched and maladaptive personality and character traits that

7

include his psychological immaturity, high level of unmet emotional needs, deeply self-centered and grandiose views of himself, lack of empathy and regard for others, rigid and domineering tendencies, and his opportunistic and self-serving tendencies." Ed revealed to Dr. Lee that he used illegal drugs in the distant past including cocaine and marijuana.

Dr. Lee diagnosed Ed with an "unspecified disruptive, impulse control, and conduct disorder" combined with an "unspecified personality disorder with narcissistic, paranoid, and antisocial traits." This led Dr. Lee to conclude that Ed's "prognosis for significant and lasting changes is limited and poor." Dr. Lee, therefore, did not support Ed to be an "independent caretaker to [Jay] at this time or in the foreseeable future, with this coming at a point over three years since the child's birth and life, and his relative non-involvement with this child."

Dr. Lee also recommended in his report a number of personal rehabilitative services for Ed's including:

> Some individual counseling or psychotherapy with a licensed or qualified clinician to address his deeply-entrenched and maladaptive personality and character traits, improving his coping and problem solving, personal and social responsibility, acceptance of responsibility, stress management, relationship functioning, and self-esteem. He should have some random drug testing to ensure the veracity of his

accounts, with the obvious expectation that he fully abstain from drug abuse. If there are indications of substance usage, he should have a comprehensive substance abuse evaluation and maintain complete drug abstinence. He should complete protracted and approved anger management and domestic violence programs. He should complete an approved parenting education program. He should certainly abstain from criminal, violence, and substance abuse problems. He should demonstrate stable and appropriate residence, relationships, and employment and/or financial resources. If he is to continue in his marriage, he and his wife should consider some form of marital counseling given accounts of some issues in their marriage. . . .

Dr. Lee noted specifically that "other forms of permanency for [Jay] besides reunification or placement [with Ed.]" would serve Jay's best interests.

Ed's very sporadic contact with the Division continued through January, 2024 and, as of that date, Ed had not taken any effort to schedule any visits with Jay. He was noted by the caseworkers to be "ambivalent about having [Jay] in his care."

On January 10, 2024, Ed participated in mediation and agreed to participate in a substance evaluation, to engage in the therapeutic parenting time with Jay, and to provide an updated address to the Division. At this hearing after mediation, the Division's caseworker provided Ed with Jay's resource parent's telephone number to allow him to contact Jay directly. Ed

9

crumpled up the paper with the telephone number on it and threw it away.

The guardianship trial began on February 9, 2024, continued on February 29, 2024, and concluded on March 13, 2024. Two Division case workers testified along with Dr. Lee. Ed testified on his own behalf and did not offer any additional witnesses nor any expert testimony to refute the Division's proofs.

On March 28, 2024, the trial court issued an order after a comprehensive oral decision granting the Division's request to terminate Ed's and Tina's parental rights to Jay. After finding both the Division's caseworkers' and expert's testimony to be credible, and Ed's not, the trial court concluded the Division satisfied the statutory best-interest test under N.J.S.A. 30:4C-15.1(a)(1)-(4) clearly and convincingly. Ed appealed and we affirmed the trial court's decision in an unpublished opinion. N.J. Div. of Child Prot. & Permanency v. T.B. and E.R. A-2469-24 (App. Div. March 3, 2025).

The Supreme Court granted Ed's certification petition and remanded the matter to us with instructions to review our decision without regard to Ed's non-compliance with the ICPC evaluation.

II.

We review a trial court's decision to terminate parental rights with

deference to it if its factual findings are "grounded in substantial and credible evidence in the record." N.J. Div. of Child. Prot. & Permanency v. D.C.A., 256 N.J. 4, 19 (2023). "Deference is especially appropriate when the evidence is largely testimonial and involves questions of credibility." T.M.S. v. W.C.P., 450 N.J. Super. 499, 502 (App. Div. 2017) (quoting Cesare v. Cesare, 154 N.J. 394, 412 (1998)). "We accord deference to factfinding of the family court because it has the superior ability to gauge the credibility of the witnesses who testify before it and because it possesses special expertise in matters related to the family." N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 448 (2012). To that end, "a trial court's factual findings 'should not be disturbed unless they are so wholly unsupportable as to result in a denial of justice.'" N.J. Div. of Youth & Fam. Servs. v. P.P., 180 N.J. 494, 511 (2004) (quoting In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002)). We do not defer to any legal conclusions, however. N.J. Div. of Child Prot. & Permanency v. A.B., 231 N.J. 354, 369 (2017).

"Parents have a constitutionally protected right to maintain a relationship with their children." N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 279 (2007). That right, however, "is not absolute" and is limited "by the State's parens patriae responsibility to protect children whose vulnerable lives

11

or psychological well-being may have been harmed or may be seriously endangered by a neglectful or abusive parent." F.M., 211 N.J. at 447. In guardianship cases, it is axiomatic that "[c]hildren have their own rights, including the right to a permanent, safe[,] and stable placement." N.J. Div. of Youth & Fam. Servs. v. C.S., 367 N.J. Super. 76, 111 (App. Div. 2004). We acknowledge "the need for permanency of placements by placing limits on the time for a birth parent to correct conditions in anticipation of reuniting with the child." Ibid. Thus, a parent's interest must, at times, yield to the State's obligation to protect children from harm. See N.J. Div. of Child Prot. & Permanency v. R.L.M., 236 N.J. 123, 145 (2018).

To terminate a biological parent's rights to a child, the trial court must consider the statutory best-interest test that requires the Division to prove these elements:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm;
>
> (3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement

A-2469-23

outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

[N.J.S.A. 30:4C-15.1(a).]

The Division must prove each prong by "clear and convincing evidence." N.J. Div. of Child Prot. & Permanency v. D.H., 469 N.J. Super. 107, 115 (App. Div. 2021). These prongs are not separate nor distinct. R.L.M., 236 N.J. at 145. Rather, they overlap to generate a general inquiry as to whether termination of parental rights serves a child's best interests. Ibid. "The question ultimately is not whether a biological mother or father is a worthy parent, but whether a child's interest will best be served by completely terminating the child's relationship with that parent." N.J. Div. of Youth & Fam. Servs. v. T.S., 417 N.J. Super. 228, 249 (App. Div. 2010) (quoting N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 108 (2008)). "[P]arental fitness is the key to determining the best interests of the child." N.J. Div. of Youth & Fam. Servs. v. I.S., 202 N.J. 145, 170 (2010) (quoting In re Guardianship of K.H.O., 161 N.J. 337, 348 (1999)).

## A.

The Division, under prong one of N.J.S.A. 30:4C-15.1(a), must prove by clear and convincing evidence "the child's safety, health, or development has been or will continue to be endangered by the parental relationship." "[T]he Division must prove harm that 'threatens the child's health and will likely have continuing deleterious effects on the child.'" N.J. Dep't of Child. & Fams. v. A.L., 213 N.J. 1, 25 (2013) (quoting K.H.O., 161 N.J. at 352). "Although a particularly egregious single harm" can suffice, "the focus is on the effect of harms arising from the parent-child relationship over time on the child's health and development." K.H.O., 161 N.J. at 348.

Ed argues the Division presented no evidence that he physically, emotionally, or psychologically harmed Jay. He also contends that his uncertainty of Jay's paternity until he was contacted by the Division does not constitute neglect. The trial court rejected these arguments and concluded that Ed's testimony about his attempted involvement in Jay's life was less-than-credible. The record supports the trial court's conclusions. Despite representations to the contrary, Ed indeed knew about Tina's pregnancy, Jay's birth, and was also aware of Tina's ongoing drug use. Notwithstanding this knowledge, Ed, nevertheless, failed to assume any parental duties. This

14

contributed to the harm suffered by Jay. A parent's failure to nurture and care for a child over an "extended period of time is in itself a harm that endangers the health and development of the child." In re Guardianship of D.M.H., 161 N.J. 365, 379 (1999) (citing K.H.O., 161 N.J. at 352-54).

Dr. Lee concluded that Ed possessed characteristics that were detrimental to his parenting abilities. Ed was noted to be "immature, egocentric, self-centered, and harboring anger and resentment." Combined with any "history of involvement with [Jay being] largely absent", Ed's "knowledge of parenting and childrearing include[d] areas of deficit." Both harm Jay. Based on these observations, Dr. Lee opined it was "unlikely" that Ed "would be able to be a minimally adequate parent" to Jay. If Jay and Ed were to be unified, according to Dr. Lee, Ed's "inability to provide a minimal level of proper parenting" would expose Jay to "risks of harm." This expert testimony was uncontroverted.

Finally, the trial court correctly acknowledged the Division's concerns about Ed's history of domestic violence and potential substance abuse combined with the lack of any rehabilitative efforts. The trial judge noted Ed

> was not present in [Jay's] life when the initial Dodd
> removal occurred and was- he was not present before
> the Dodd or after. [Jay] is about to turn four years
> old, yet [Ed] has never met [Jay] and has not made

15

himself available as a parent. He has not taken any steps to become a parent and has sat on his rights as a parent. Not stepping up to be a parent when one is aware of their child is a harm in and of itself. He has consistently failed to provide any parental functions to [Jay].

Ed's lack of contact with Jay with "despite being given many avenues to do so" satisfies us the Division proved prong one clearly and convincingly. We discern no reason to disturb the trial court's well-reasoned findings.

B.

Prong two relates to parental unfitness. K.H.O., 161 N.J. at 352. The inquiry "centers on whether the parent is able to remove the danger facing the child." F.M., 211 N.J. at 451 (citing K.H.O., 161 N.J. at 352). This prong "may be met by indications of parental dereliction and irresponsibility, such as the parent's continued or recurrent drug use, the inability to provide a stable and protective home, [and] the withholding of parental attention and care." K.H.O., 161 N.J. at 353. "The determinative issue is whether the circumstances surrounding the parental relationship, including any relationships with [others], cause harm to the child." M.M., 189 N.J. at 289.

Ed contends his lack of completion of the ICPC process is not proof that he is unable to parent Jay. He asserts that his perceived "instability" was not established clearly and convincingly because he maintained multiple jobs and

16

consistently lived in the same home. He argues the Division's reliance on the ICPC evaluation was designed to erect a barrier to his unification with Jay.

It is uncontroverted that Ed did not comply with the ICPC evaluation. We also acknowledge, as the Supreme Court noted, the ICPC "does not apply to matters concerning parents and other enumerated relatives." N.J.S.A., 9:23-5, art. VII, subd. (a). However, despite Ed's assertion that lack of compliance with the ICPC evaluative process was central to the decision to terminate his parental rights, it was not. As the trial court found and as the record substantiates, many impediments broadly illustrate Ed's parental unfitness.

Ed had not addressed the domestic violence and substance abuse concerns the Division identified, Ed had not engaged in any parenting time with Jay, and as critically as it applies to prong two, Ed did not establish any reliable timeline to address these concerns and, therefore, offer the permanency Jay required.

As was noted by Dr. Lee and confirmed by the trial court, Ed "would need another year of therapy because of domestic violence concerns and [Ed] had not started any of the therapy or [other rehabilitative services as of the date of the trial]." As aptly noted by the trial judge, Jay "is at a crucial age

now and cannot wait for his father to start processes indefinitely." Further, as the trial court specifically noted, Ed's "stability is questionable."

We consistently recognize a child's interests must be balanced and that "[p]arents do not have the right to extend litigation indefinitely until they are able to safely care for their children." N.J. Div. of Child Prot. & Permanency v. S.D., 453 N.J. Super. 511, 524 (App. Div. 2018). Children "have their own rights, including the right to a permanent, safe[,] and stable placement." C.S., 367 N.J. Super. at 111. We acknowledge "the need for permanency of placements by placing limits on the time for a birth parent to correct conditions in anticipation of reuniting with the child." Ibid. A parent's delay while a child is in placement constitutes harm. "In other words, the issue becomes whether the parent can cease causing the child harm before any delay in permanent placement becomes a harm in and of itself." New Jersey Div. of Youth & Fam. Servs. v. F.H., 389 N.J. Super. 576, 617 (App. Div. 2007).

Even if Dr. Lee found no underlying pathology rendering Ed unable to parent, Ed clearly failed to demonstrate the necessary urgency to parent Jay both while Jay was in Tina's care, with knowledge that Tina continued to abuse drugs, and after his son was placed in resource care. Ed has never taken the

18

steps necessary to parent Jay during Jay's lifetime. He has been unwilling to accept any personal responsibility for Jay's instability throughout Jay's life.

Therefore, we discern no error in the trial court's thorough findings that the Division proved prong two by clear and convincing evidence.

## C.

Prong three requires the Division to make "reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home" and to consider "alternatives to termination of parental rights." N.J.S.A. 30:4C-15.1(a)(3). Reasonable efforts are fact specific. N.J. Div. of Youth and Fam. Servs. v. R.G., 217 N.J. 527, 557 (2014). Generally, the Division must "provide services to the family according to a case plan, including enlisting the assistance of relatives, providing direct services, or providing referrals to community services providers." D.M.H., 161 N.J. at 387. The Division also "must monitor the services, change them as needs arise, and identify and strive to overcome barriers to service provision or service utilization." R.G., 217 N.J. at 557 (quoting D.M.H., 161 N.J. at 387). The Division should, among other things, "encourage, foster[,] and maintain" the parent-child bond, "promote and assist in visitation," and inform parents of

"appropriate measures [they] should pursue . . . to . . . strengthen" the relationship with their child. Ibid. (quoting D.M.H., 161 N.J. at 390).

Ed argues that the trial court improperly analyzed the Division's efforts to both parents jointly, rather than on the unification efforts provided directly to Ed. Ed claims the Division impermissibly erected barriers to unification when it required participation with the ICPC and the Division failed to provide services for concerns that the Division itself had highlighted. However, as the trial court found, and as is supported by the record, the opposite is true.

The Division consistently invited Ed to planning meetings for Jay and worked diligently to maintain contact with him by telephone calls, emails, and text messages. As the trial court noted, and as we agree, "the Division has offered and given satisfactory services and opportunities based on [Ed's] level." The efforts made by the Division were, however, only met with Ed's inaction. As the trial court correctly concluded, "[s]uch nonaction is indicative of [Ed's] future nonaction."

The Division also considered alternatives to the termination of parental rights. The trial court credited the caseworker that it assessed proposed relatives and possible caregivers and discussed kinship legal guardianship with Jay's resource parents.

A-2469-23

Substantial credible evidence in the record clearly and convincingly supports the trial court's finding that the Division provided reasonable efforts to Ed.

D.

Prong four requires the court to determine that the "[t]ermination of parental rights will not do more harm than good." N.J.S.A. 30:4C-15.1(a)(4). This prong does not require a showing that no harm will come to the child "as a result of the severing of biological ties." K.H.O., 161 N.J. at 355. Instead, the issue is "whether a child's interest will best be served by completely terminating the child's relationship with that parent." E.P., 196 N.J. at 108. "The crux . . . is the child's need for a permanent and stable home, along with a defined parent-child relationship." H.R., 431 N.J. Super. at 226. Ed contends that the Division's proof is insufficient to establish this fourth prong. Specifically, he argues despite the Division's representation that Jay was "very bonded" to his resource parent, the Division failed to provide the results of any bonding evaluation that would substantiate that assertion. He also argues the trial court impermissibly relied on hearsay to satisfy this element.

In this matter, a bonding evaluation would have been futile because Ed had never parented Jay prior to his removal from Tina's care, and Ed never

A-2469-23

exercised any parenting time with Jay. The gravamen of the Division's case against Ed was that he was both unwilling and unable to parent Jay. This was established by Dr. Lee's conclusions that Ed was currently unfit to care for Jay and would be unable to do so in the foreseeable future.

We reject Ed's argument that the trial court's findings were improperly tainted by the introduction of evidence of various inadmissible hearsay documents offered by the Division. Rule 5:12-4(d) permits the Division to submit into evidence "reports by staff personnel or professional consultants," but it must do so "pursuant to N.J.R.E. 803(c)(6) and 801(d)," which refer to the business record exception. Nonetheless, reports admitted pursuant to Rule 5:12-4(d) are still subject to other hearsay limitations, including those imposed by N.J.R.E. 805 concerning embedded hearsay statements, and N.J.R.E. 808, concerning expert opinion included in a hearsay statement admissible under an exception. See, e.g., In re Guardianship of Cope, 106 N.J. Super. 336, 343 (App. Div. 1969) (holding "the [Division] should be permitted to submit into evidence, pursuant to [former] Evidence Rules 63(13) and 62(5), reports by [Division] staff personnel (or affiliated medical, psychiatric, or psychological consultants), prepared from their own first-hand knowledge of the case").

Applying these principles, we discern no error in the court's admission of the various reports and documents.

Ed's other arguments that we have not specifically addressed are without sufficient merit to warrant discussion. R. 2:11-3(e)(1)(e).

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

*M.C. Harley*

Clerk of the Appellate Division